IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA              CR No. 1:21-cr-00160-TJK-5

                                      Washington, D.C.
     v.                               Friday, July 2, 2021
                                      9:15 a.m.


WILLIAM CHRESTMAN,
                    Defendant.
- - - - - - - - - - - - - - - - x
_____

                    TRANSCRIPT OF ORAL RULING
          HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                 UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:   Christopher Berridge, Esq.
                         U.S. ATTORNEY'S OFFICE FOR THE
                         DISTRICT OF COLUMBIA
                         555 4th Street, NW
                         Washington, DC 20001
                         (202) 252-6685


For the Defendant:       Peter A. Cooper, Esq.
                         PETER A. COOPER
                         400 5th Street, NW
                         Suite 350
                         Washington, DC 20001
                         (202) 400-1431


Court Reporter:          Timothy R. Miller, RPR, CRR, NJ-CCR
                         Official Court Reporter
                         U.S. Courthouse, Room 6722
                         333 Constitution Avenue, NW
                         Washington, DC 20001
                         (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                              **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  We are on the record in

3       criminal matter 21-160, Defendant 5, United States of

4       America v. William Chrestman.

5              Present for the Government is Christopher

6       Berridge; present for the defendant is Peter Cooper; and

7       also present is the defendant, Mr. Chrestman.

8              THE COURT:  All right.  Well, good morning to

9       everyone.  Thank you for gathering very quickly here.

10              I do want to rule on the motion to reconsider.

11      I'm going to deny the motion to reconsider and leave Chief

12      Judge Howell's detention order in place.  And I'm going to

13      go ahead and explain the reasons for that decision here

14      today.  I did go over the evidence, the allegations, Chief

15      Judge Howell's opinion, and the arguments and submissions of

16      the parties very closely, and I wanted to get back to you as

17      soon as I can -- as soon as I could with an answer.

18              Before I talk about some of the history and some

19      of the specifics here, let me just set out the basic legal

20      framework of detention.

21              In our society, liberty is the norm, and detention

22      prior to trial or without trial is the carefully limited

23      exception.  That's United States v. Salerno, 481 U.S. 739 at

24      755, a Supreme Court case from 1987.  And under the Bail

25      Reform Act, or BRA, 18 United States Code Sections 3141

1    through 3156, Congress limited pretrial detention of persons

2    who are presumed innocent to a subset of defendants charged

3    with crimes that are the most serious compared to other

4    federal offenses.  That's United States v. Singleton, 182

5    F.3d 7 at 13, a D.C. Circuit case from 1999 that was quoting

6    Salerno.  Thus, a detention hearing must be held at the

7    government's request only in a case that involves a charged

8    offense falling into one of five enumerated categories or if

9    the defendant poses a serious risk of flight or of trying to

10   obstruct justice or threaten -- or to threaten, injure or

11   intimidate a witness or juror.

12           The BRA provides that a -- that the judicial

13   officer shall order the detention of the defendant before

14   trial if a detention hearing is held under 18 United States

15   Code 3142(f), and upon consideration of, quote, The

16   available information concerning certain enumerated factors,

17   3142(f) and that are set out in 3142(g), the judicial

18   officer finds that no condition or combination of conditions

19   will reasonably assure the appearance of the person as

20   required and the safety of any other person and the

21   community.  That's 3142(c)(1) [sic].  In common --

22           THE DEPUTY CLERK:  Judge Kelly --

23           THE COURT:  -- parlance, the relevant inquiry --

24           THE DEPUTY CLERK:  Judge Kelly --

25           THE COURT:  Yes?  Yes?

1          THE DEPUTY CLERK:  It looks like we've lost

2    Mr. Cooper -- oh, he's coming back now.

3          THE COURT:  All right.  Mr. Cooper, did we lose

4    you there for a second?

5          MR. COOPER:  Yes, but I believe I'm back now.  Am

6    I back?

7          THE COURT:  You are.  You -- we can see you, yes.

8    I wasn't sure whether your screen just went blank or whether

9    we had truly lost the connection, but it -- you're back.  We

10   can see you.  We -- and hear you.

11         Thank you, Ms. Harris, for pointing that out.

12         As I said, in common parlance, the relevant

13   inquiry is whether the defendant is a flight risk or a

14   danger to the community.  That's United States v.

15   Vasquez-Benitez, 919 F.3d 546 at 550, a D.C. Circuit case

16   from 2019.  The BRA requires that detention be supported by

17   clear and convincing evidence when the justification is

18   safety to -- of the community.  That's United States v.

19   Simpkins, 826 F.2d 94 at 96, a D.C. Circuit case from 1987.

20   And even if the defendant does not pose a flight risk,

21   danger to the community alone is sufficient reason to order

22   pretrial detention.  That's the Salerno case at 755.

23         And really quickly, I'll run through the factors.

24         In assessing whether pretrial detention or release

25   is warranted, the judicial officer must take into account

1    the available information concerning these four factors: the

2    nature and circumstances of the offense charged, including

3    whether the offense is a crime of violence; two, the weight

4    of the evidence against the person; three, the history and

5    characteristics of the person, including the person's

6    character, physical and mental condition, family ties,

7    employment, financial resources, length of residence in the

8    community, community ties, past conduct, history relating to

9    drug or alcohol abuse, criminal history, and record

10   concerning appearances at court proceedings; and, four,

11   finally, the nature and circumstance -- seriousness of the

12   danger to any person or the community that would be posed by

13   the person's release.  Again, that's 18 United States Code

14   3142(g).  And at the detention hearing, both the government

15   and the defendant may offer evidence or proceed by proffer.

16   United States v. Smith, 79 F.3d 1208 at 1210, a D.C. Circuit

17   case from 1996.

18          With that background, let me just run through

19   quickly how we got here and what Chief Judge Howell found.

20   I'm not going to, obviously, go into every detail of her

21   ruling, but I do want to put some of it here on the record.

22   Well, first, federal law enforcement officers arrested

23   Mr. Chrestman and executed a search warrant at his home on

24   February 11th, 2021.  That's ECF No. 27 at 6.  Upon his

25   arrest, the Government moved for a detention -- for

1        detention pending trial and, on February 17th, a magistrate

2        judge in the District of Kansas held a detention hearing.

3        On February 19th, the magistrate denied the Government's

4        motion for detention and ordered the defendant to be

5        released to home incarceration with electronic monitoring.

6        The Government filed motions to stay release and for review

7        and appeal of the release order.  And the District Court for

8        the District of Columbia held a hearing on the defendant --

9        on the Government's motion for review and appeal of the

10       release order on February 23rd.

11              And at that hearing, Chief Judge Howell granted

12       the Government's motion and reversed the magistrate judge's

13       decision.  Judge Howell subsequently issued a memorandum

14       opinion explaining her decision.  That is on the docket at

15       ECF No. 27.  And it is worth reciting her analysis of the

16       BRA factors that I just mentioned a moment ago.

17              Judge Howell found that the first factor, the

18       nature and circumstances of the defendant's offenses,

19       strongly weighed in favor of detention.  This is Page 18 of

20       her opinion.  In making that finding, she relied on the

21       Government's proffer that Mr. Chrestman traveled from his

22       home in Kansas to the nation's capital, prepared with an axe

23       handle, a helmet, a gas mask, and tactical gear, to

24       participate in a demonstration on January 6th, 2021.  That's

25       the opinion at 17.  On that day, Chrestman, quote, Assembled

1    with other members of the Proud Boys and marched with them

2    on the Capitol grounds, closed quote.  Again, it's the

3    opinion, Page 17.  All of these cites will be the opinion

4    from Page 17.  He, quote, Pushed to the front of the crowd,

5    toppling police barriers and overwhelming police lines as

6    they advanced, closed quote.  He stood directly in front of

7    a group of Capitol Police and threatened them by shouting,

8    quote, You shoot and I'll take your fucking ass out, closed

9    quote.  Open quote, As he moved closer to the Capitol,

10   defendant donned first his helmet and then his gas mask and

11   revealed his axe handle, closed quote.  Once his group

12   breached the Capitol, he, quote, Guided his co-conspirators'

13   efforts to obstruct the metal barriers being lowered by law

14   enforcement to prevent unlawful entry into the tunnels

15   underneath the Capitol, closed quote.  He personally

16   obstructed one barrier with his axe handle.  Throughout

17   these events, He appeared to -- quote, He appeared to act as

18   a leader of the gathering mob, encouraging them to take the

19   Capitol and to interfere with the Capitol Police as they

20   attempted to arrest one individual.

21          Judge Howell thoroughly analyzed the offenses for

22   which Mr. Chrestman is charged.  She identified that he

23   faces a charge of threatening to assault a federal law

24   enforcement officer, in violation of 18 United States Code

25   115(a)(1)(B), which constitutes a crime of violence within

1    the meaning of Section 3142(g).  Although his remaining
2    felony charges are not crimes of violence, she found that
3    his, quote, Underlying conduct clearly demonstrates a risk
4    of danger to the community, closed quote, because he, quote,
5    Sought and succeeded in creating mayhem on the Capitol
6    grounds and interfering with the Capitol Police, all in the
7    furtherance of the goal of disrupting Congress's fulfillment
8    of its constitutional duty to certify the vote count of the
9    Electoral College and thus interfering with -- or even
10   preventing -- the peaceful transition of power, closed
11   quote.  That's from Page 18 of her opinion.  The nature and
12   circumstance of his offenses, Judge Howell reasoned, quote,
13   Evince a clear disregard for the law, concerted and
14   deliberate efforts to undermine law enforcement, and an
15   apparent willingness to take uncoordinated -- to take -- I'm
16   sorry -- coordinated, pre-planned, and egregious actions to
17   achieve his unlawful aims, all of which indicate that he
18   poses a danger to the community.  Judge Howell -- closed
19   quote.  And that's, again, Page 18.
20           Judge Howell also found that the weight of the
21   evidence against Mr. Chrestman strongly favored detention.
22   In support of that finding, she cited the Government's
23   representation that, quote, Dozens of videos and photographs
24   exist to prove not only that -- defendant's participation in
25   the Capitol riot, but also the specific actions of which he

1    is accused, closed quote.  That's Page 19.  Specifically,

2    quote, Photos and video footage clearly show defendant in

3    the front of the crowd interfering with police barriers,

4    confronting and threatening law enforcement, encouraging the

5    crowd to take the Capitol, and leading the mob and his

6    co-conspirators in efforts to keep the metal barriers in the

7    Capitol tunnels from closing, including by using his axe

8    handle.  In addition, the Government has obtained records

9    from Google showing that a Google account associated with

10   defendant's cell phone number was collected [sic] to Google

11   services in or around the Capitol on January 6th, 2021,

12   closed quote.

13          Judge Howell then found that the third pretrial

14   detention factor, the history and characteristics of the

15   defendant, further weighed in favor of detention.  That's

16   Page 27.  She noted that parts of Mr. Chrestman's history

17   were to his credit and indicated that he did not pose a

18   flight risk.  Those facts included that he has a very

19   limited criminal history, if any; that he has, quote, Fairly

20   strong ties to the area in which he resides, closed quote;

21   has lived in the Kansas City, Kansas, area for 17 years;

22   and, quote, Currently resides with his partner and has

23   relationships with his three children who live nearby, the

24   youngest of whom lives with the defendant part time; also,

25   that he was gainfully employed prior to the COVID-19

pandemic and is a U.S. Army veteran who was honorably
discharged.

However, Chief Judge Howell explained that his
recent behavior surrounding the events of January 6th gave
rose [sic] to significant concerns.  First, although two
months had passed from January 6th to her ruling,
Mr. Chrestman had not exhibited any remorse for what
occurred at the Capitol.  The lack of remorse supported her
finding that there was, No -- quote, No evidentiary basis to
assume that the defendant will refrain from similar
activities, if instructed, in the future.  That's Page 28.
Second, Mr. Chrestman's conduct after January 6th raised
concerns about whether he was trying to obstruct or conceal
evidence.  Mr. Chrestman did not flee upon learning that he
may face charges, but he also did not voluntarily surrender.
And when the government searched his home, they found many
items that could corroborate his role on January 6th were
missing, including camouflage clothing, his tactical gear --
tactical gear such as his black helmet and gas mask.  And
law enforcement also found his cell phone hidden in a
dresser drawer in his six-year-old child's bedroom.
Although law enforcement did recover one handgun from a
vehicle parked outside the defendant's home, they did not
find his rifle marked with the Proud Boys acronym that law
enforcement had seen him with on social media posts or any

1    other firearm.  And one of defendant's co-conspirators later

2    revealed to law enforcement that Mr. Chrestman gave that

3    rifle and other firearms to the co-conspirator for

4    safekeeping upon their return to Kansas City from

5    Washington, D.C.  That is all from Page 28 of Chief Judge

6    Howell's opinion.

7         Chief Judge Howell inferred that Mr. Chrestman may

8    have tried to conceal or discard evidence and, if released,

9    could take further steps to impede the investigation.

10   That's Page 29.  She further noted the Government's concern

11   that Mr. Chrestman might try to intimidate known and unknown

12   co-conspirators and prevent them from providing information

13   to law enforcement.

14        Finally, Chief Judge Howell found that the nature

15   and seriousness of the danger to the community posed by

16   Mr. Chrestman's release also weighed heavily in favor of

17   detention.  She found that Mr. Chrestman's conduct, quote,

18   Showed a clear disregard for the safety of others.  He not

19   only violated the law himself but encouraged others to

20   engage in the lawful [sic] conduct and made it easier for

21   them to do so by obstructing police barriers, all the while

22   shouting threats at Capitol Police and leading others in

23   what he described as an effort to take the Capitol.

24   Defendant's participation and de facto leadership role --

25   including as the ringleader of an alleged conspiracy -- in

1     the assault of the Capitol, his use of the axe handle as an

2     offensive weapon that day, and his brazen actions when

3     confronting and impeding law enforcement on Capitol grounds

4     and inside the Capitol itself all support the conclusion

5     that he poses a danger to the community, closed quote.

6              Judge Howell further focused on Chrestman's,

7     quote, Pre-planning and coordination with other rioters

8     before, during, and after the riot, closed quote, because he

9     traveled to the nation's capital equipped with tactical gear

10    in preparation for conflict with law enforcement, including

11    a helmet and gas mask for defensive use and an axe handle

12    for offensive use.  He coordinated with members of the Proud

13    Boys and others to come to Washington, D.C., to march on the

14    Capitol and to impede law enforcement at every turn once on

15    the Capitol grounds.  Nearly as significant is defendant's

16    use of force to advance towards the Capitol and his words to

17    lead and guide the mob in obstructing the police and pushing

18    against the police barriers and to threaten officers while

19    brandishing a wooden club.  All this conduct was undertaken

20    with total disregard for the law and for official

21    directives.  That's Page 31 of the opinion.

22             And Chief Judge Howell concluded that no condition

23    or combination of conditions could assure Mr. Chrestman's

24    compliance with any release conditions.  She found the

25    District of Kansas magistrate judge's conditions of home

1      incarceration with electronic monitoring insufficient to

2      reasonably assure the safety of the community because of --

3      all the pre-planning, coordination, and obstructive conduct

4      alleged by the Government took place while the defendant was

5      at his home.  Page 31.  And his very actions on January 6th

6      make apparent that he will follow his beliefs and his fellow

7      gang members, even when the laws designed to protect our

8      democracy prohibit his conduct, closed quote.

9             Following Chief Judge Howell's detention order,

10     the grand jury returned an indictment -- which is ECF No.

11     29 -- against Mr. Chrestman and his co-defendants charging

12     them with the following offenses: conspiracy, in violation

13     of 18 United States Code 371; obstruction of an official

14     proceeding, in violation of 18 United States Code

15     1512(c)(2); civil disorder, in violation of 18 United States

16     Code 231(a)(3); threatening a federal officer, in violation

17     of 18 United States Code 115(a)(1)(B); and entering or

18     remaining on restricted buildings or grounds with a

19     dangerous weapon enhancement, in violation of 18 United

20     States Code 1752(a)(1) and (2) and (b)(1)(A).  Following the

21     indictment, the case was transferred to me.  And

22     Mr. Chrestman has now moved for his release and asked the --

23     me to reconsider Chief Judge Howell's decision to detain

24     him.  I heard argument on the motion on June 24th.

25             The parties -- so with all of that as a long

1  lead-in, the parties agree on the relevant standard that

2  governs a motion for reconsideration.  If the defendant is

3  ordered detained under 3142 by a judicial officer, the BRA

4  allows that the detention hearing, quote, May be reopened,

5  before or after a determination by the judicial officer, at

6  any time before trial if the judicial officer finds that

7  information exists that was not known to the movant at the

8  time of the hearing and that has a material bearing on the

9  issue of whether there are conditions of release that will

10 reasonably assure the appearance of such person as required

11 and the safety of other -- any other person and the

12 community.  Whether information has a material bearing turns

13 on whether it is, quote, The sort of information essential

14 to, or capable of significantly affecting, the detention

15 decision.  That's United States v. Worrell, 2021 WL 2363934.

16 That's a D.D.C. case from June 9th, 2021.  In other words,

17 quote, Previously unavailable information that -- has no

18 material bearing on the factors that must be considered to

19 establish the propriety of pretrial detention unless the new

20 information casts a different light on any of those factors.

21 United States v. Lee, 451 F. Supp. 3d 1 at 5, a D.D.C. case

22 from 2020.

23          Additionally, in this District, judges apply the,

24 quote, As justice requires, standard from the Federal Rule

25 of Criminal [sic] Procedure 54(b) to motions for

1     reconsideration of interlocutory orders such as a pretrial

2     detention order.  That's U.S. v. Hong Vo, 978 F. Supp. 2d 41

3     at 47 through 48, a D.D.C. case from 2013.  Quote, Asking

4     what justice requires amounts to determining, within the

5     court's discretion, whether reconsideration is necessary

6     under the relevant circumstances.  Those circumstances

7     include when a court has patently misunderstood the parties,

8     made a decision beyond the adversarial issues presented, or

9     made an error in failing to consider controlling decisions

10    to date, or where a controlling or significant change in the

11    law has occurred.  But where litigants have once battled for

12    the court's decision, they should not be permitted to battle

13    for it again.  That's Page 48 of that opinion that's both

14    cleaned up and with citations and quotations omitted.  The

15    burden is on the moving party to show that reconsideration

16    is appropriate and that harm or injustice would result if

17    reconsideration were denied, closed quote.  That's Jones v.

18    the District of Columbia, 2019 WL 5690341, a D.D.C. case

19    from June 13th, 2019.

20             Mr. Chrestman essentially raises three facts that

21    he argues support reopening his detention hearing.  First,

22    he argues that the pre-existing medical conditions -- that

23    his pre-existing medical conditions warrant reconsideration

24    of his detention order, ECF No. 74 at 6; second, he argues

25    that the Court should reconsider his detention in light of

1    danger that the residence he shares -- or the risk that the

2    residence he shares with his partner and their children will

3    be foreclosed on; and, third, he submits a statement from

4    January 6th that, in his view, would have altered Chief

5    Judge Howell's detention determination.  And I'm going to --

6    I will -- each -- I will address each of those in order.

7          Mr. Chrestman suffers from several health

8    conditions.  He has long-term chronic back pain, ADHD, and

9    major depressive disorder and insomnia.  He represents that

10   he's not receiving adequate medical care during his period

11   of detention.  And relatedly, he submits that, due to his

12   detention, he is at risk of losing his VA health care

13   benefits.

14         And I'm not at all convinced that the existence of

15   these medical conditions constitutes information that was

16   not known to the movant at the time of his detention hearing

17   with Judge Howell.  But even assuming that it does, that

18   information does not have a material bearing on her analysis

19   because it does not cast Chief Judge Howell's analysis of

20   the detention factors in a different light or undermine her

21   reasoning.  As the Government points out, Mr. Chrestman

22   suffered from these conditions when he organized and

23   participated in the January 6th riots.  Mr. Chrestman

24   replies that the Government -- that the Court should still

25   consider these facts in the overall context of his history

1    and characteristics; however, this fact, along with other

2    facts Judge Howell considered, does not have a material

3    bearing on her analysis of his history and characteristics.

4    Mr. Chrestman, again, suffered from these conditions on

5    January 6th and still took the actions that I've already

6    recounted as described in Chief Judge Howell's opinion.  And

7    this medical history does not affect Chief Judge Howell's

8    finding that, after the riot, Mr. Chrestman may have

9    attempted to conceal or discard evidence that could

10   corroborate his involvement in the riot.  And so it doesn't

11   affect the analysis in that way.

12          The other arguments Mr. Chrestman raises related

13   to his medical condition also do not support reopening his

14   detention hearing.  If Mr. Chrestman believes he is not

15   receiving adequate care while in pretrial detention, that's

16   a serious issue that he can -- he should first raise with

17   the D.C. Jail authorities, with Mr. Berridge and the

18   Government, and ultimately with me if he's not being cared

19   for properly, but it doesn't really materially affect Chief

20   Judge's -- Chief Judge Howell's analysis.  And the

21   possibility of him losing his VA benefits, although very

22   regrettable if that's true, does not, again, have a material

23   bearing on the BRA analysis undertaken by Chief Judge Howell

24   either.  He -- Mr. Chrestman doesn't explain how that

25   risk -- that -- or -- affects or casts doubt on that

1    analysis.  Again, these are -- both of these are very

2    unfortunate byproducts, if true, of his detention, but they

3    do not materially affect the analysis about whether he

4    should be detained.

5           Second, Mr. Chrestman represents that his

6    common-law wife and his six children are facing foreclosure

7    on their residence.  And if that is true, that is a very

8    terrible and unfortunate thing.  But, again, it doesn't

9    affect, in my view, Chief Judge Howell's analysis of

10   Mr. Chrestman's history and personal characteristics.  Judge

11   Howell noted that Mr. Chrestman's family ties are to his

12   credit and show that he does not possess -- that he does not

13   pose a flight risk; however, the new information does not

14   mitigate the information in the record that Chief Judge

15   Howell found justified detention, including his actions on

16   January 6th, his lack of remorse, his actions -- and his

17   actions upon returning to Kansas City.

18          And finally, Mr. Chrestman proffers the following

19   statement from a series of short video clips from January

20   6th that -- which the Government provided him:  Quote, And

21   we did it all without hurting a fucking single person.

22   That's the difference between the left and the right.  We

23   could have easily taken out the cops, and we didn't, 'cause

24   in reality we love the cops.  That's ECF No. 78 at 1.

25          This statement, too, does not have a material

1    bearing on Chief Judge Howell's detention -- her detention
2    decision and her weighing of the BRA factors.  Mr. Chrestman
3    argues that the statement reflects, quote, A person who is
4    observing the fact that no one was exposed to any danger and
5    displaying his and his co-protesters' respect for the men
6    and women of law enforcement that day, closed quote.  ECF
7    No. 78 at 2.  But the allegations and the evidence that has
8    been proffered by the Government really -- about his
9    behavior that day greatly undercut that argument.
10              And, again, throughout -- as I've already gone
11   through and as Chief Judge Howell -- as reflected in Chief
12   Judge Howell's opinion, throughout January 6th and
13   afterward, Mr. Chrestman showed little regard for law
14   enforcement.  When he approached the Capitol building, he
15   stood directly in front of the Capitol Police officers and
16   yelled, You shoot and I'll take your fucking ass out.  ECF
17   No. 74 at 4 -- No. 27 at 4.  That's Chief Judge Howell's
18   opinion.  And when the Capitol Police tried to arrest a
19   member of the crowd, he, quote, Encouraged others to stop
20   the police, saying, among other things, Don't let them take
21   him, closed quote.  When the Capitol Police were trying to
22   protect the building from the approaching mob,
23   Mr. Chrestman, wearing the police mask -- wearing a gas
24   mask, addressed the crowd, shouting, Whose house is this?
25   And, Do you want your house back?  And telling the crowd to

1    take it.

2            Mr. Chrestman and his co-conspirators also acted

3    to topple the metal barriers used by the Capitol Police to

4    control the crowd.  When they saw law enforcement trying to

5    lower metal barriers in the tunnels underneath the Capitol

6    to seal off areas inside the building from the mob,

7    Mr. Chrestman led his co-conspirators in deliberate efforts

8    to prevent the police from closing the tunnel entrances.

9    One surveillance camera captured him using his axe handle to

10   obstruct one of the barriers.  And Mr. Chrestman's proffered

11   statement -- so as a result of all of that, Mr. Chrestman's

12   proffered statement rings hollow because his actions and

13   words that day contradict whatever generalized affection he

14   might have for law enforcement.  The statement, therefore,

15   again, does not provide any grounds for me to reconsider

16   Chief Judge Howell's detention order.

17           Because none of these new facts can't -- casts

18   Judge -- Chief Judge Howell's dissent -- decision in a new

19   light or otherwise significantly undercuts her analysis of

20   the detention factors, I don't see any reason to reconsider

21   her detention under Section 3142(f).

22           Mr. Chrestman also raises a point that I want to

23   address, the Circuit's decision in Munchel as a reason to

24   reconsider his detention.  And I don't think Munchel casts

25   any doubt either on Chief Judge Howell's analysis or it --

1    or required that Mr. Chrestman be released.  In Munchel, the

2    Circuit held that, quote, When a defendant poses a

3    particular threat -- I'm sorry -- whether a defendant poses

4    a particular threat depends on the nature of the threat

5    identified and the resources and capabilities of the

6    defendant, closed quote.  In the context of the January 6th

7    riot, quote, Those who actually assaulted police officers

8    and broke through windows, doors and barricades, and those

9    who aided, conspired with, planned or coordinated such

10   actions, are in a different category of dangerousness than

11   those who cheered on the violence or entered the Capitol and

12   -- after others cleared the way.  That's Page 1284 of the

13   Munchel decision.

14           To the extent that the Circuit divided those

15   involved in January 6th, then, into two separate

16   categories -- one, those who merely cheered on the violence

17   or entered the Capitol after others cleared the way; or

18   folks who took many of those other actions -- Mr. Chrestman,

19   I would say, essentially tries to place himself in that

20   latter group -- someone who was an observer; someone who

21   merely entered the Capitol after others cleared the way or

22   cheered on others -- but I don't think that's true.  The

23   evidence and allegations are, again, that Mr. Munchel was --

24   I mean -- I'm sorry -- Mr. Chrestman was much more -- much,

25   much more than someone who merely cheered on the violence or

1    who entered the Capitol after others cleared the way.

2              And at the risk of belaboring what I've already

3    said, I'll just say first, Mr. Chrestman is alleged to have

4    aided, conspired with, planned and coordinated with others

5    on Capitol Hill.  He's alleged to be a member of the Kansas

6    City chapter of the Proud Boys in the indictment.  The

7    indictment also charges that he traveled from Kansas City

8    with other Proud Boys and that they stayed together in a

9    short-term rental property near Washington, D.C.  Again, in

10   the indictment, Mr. Chrestman and his co-conspirators

11   brought paramilitary gear and supplies, including

12   camouflaged combat uniforms, tactical vests with plates,

13   helmets, eye protection, and radio equipment.  They also

14   acquired orange tape to put on their clothing and gear to

15   identify each other.  And on January 6th, Chief Judge Howell

16   found, Mr. Chrestman joined a group of Proud Boys near the

17   Capitol shortly before the start of the joint session of

18   Congress.  He wore camouflage pants and a green tactical

19   vest.  He also brought a gas mask, a hard black helmet

20   marked with orange tape, and an axe handle.

21             Mr. Chrestman also -- as I've described before,

22   also coordinated with others during the riot.  As Chief

23   Judge Howell found, he appeared to act as a leader not only

24   of his co-conspirators, but also of the gathering mob.  She

25   found that he guided his co-conspirators' efforts to

1    obstruct the metal barriers being lowered by law

2    enforcement.  And, again, he shouted to the Capitol -- to

3    the crowd to take the house back.

4          Second, in addition to the allegations and

5    evidence of planning and coordination and conspiracy,

6    Mr. Chrestman's own actions that day allegedly included

7    physically and verbally confronting law enforcement and

8    actively interfering with their efforts to secure the

9    building and control the riot.  I won't belabor them again

10   other than to say that, again, he used his axe handle to

11   obstruct one of the barriers in the Capitol tunnels from

12   closing.

13         And, third, to the extent -- to the -- third -- so

14   I don't think -- I -- for those two reasons, again, I don't

15   think Munchel affects the decision -- Chief Judge Howell's

16   decision.

17         And, third, to the extent that Munchel did

18   emphasize that, quote, A defendant's detention based on

19   dangerousness accords with due process only insofar as the

20   District Court determines that the defendant's history,

21   characteristics, and alleged criminal conduct make clear

22   that he or she poses a concrete, prospective threat to

23   public safety or the -- or, as the Supreme Court articulated

24   in Salerno, an identified and articulable threat to an

25   individual or the community, given all the above, that

1    language from Munchel, again, does not undermine Chief Judge

2    Howell's order.

3             There are a couple of points on this that I'd just

4    like to put on the record.

5             One is that to this day, even though his attorney

6    now writes in a footnote that he -- Mr. Chrestman disavows

7    the Proud Boys and their goals, he has expressed no specific

8    -- Mr. Chrestman has expressed no specific remorse for his

9    actions on January 6th or regret for what happened on

10   January 6th.  And the Government has submitted evidence in

11   connection with its opposition to his motion here that shows

12   exactly what Mr. Chrestman thought after the riot in an

13   unguarded moment.  In a transcribed conversation submitted

14   by the Government with its opposition to Mr. Chrestman's

15   reconsideration motion, Mr. Chrestman bragged that he,

16   quote, Boxed a cop, closed quote, suggesting that he fought

17   a member of the Capitol Police.  That's ECF No. 77-1 at

18   Pages 2 and 6.  He describes his actions as having, quoted

19   [sic], Started a revolution, closed quote.  And later in

20   that conversation, he expressed the belief that the Proud

21   Boys, quote, Membership is gonna explode, closed quote,

22   suggesting that he was thinking about the long-term future

23   of the organization.  Again, in a world in which January 6th

24   has passed but yet the notion in our politics that the 2020

25   presidential election was stolen and is still a live issue,

1    this is -- those statements reflect someone who -- do not

2    reflect someone for whom the fight is over about the

3    election.  They reflect someone who is focused on the future

4    and for whom that very much is an open -- that the fight

5    continues.  Let's put it that way.

6            In addition, the proffered evidence suggests that

7    Mr. Chrestman may have, again, as Chief Judge Howell found,

8    tried to conceal or discard evidence once he returned to

9    Kansas City.  I won't go through it again, but it's

10   reflected in her opinion.  And, again, I think that's the

11   kind of evidence that does reflect, in addition to that

12   statement and other evidence in the record, that there is --

13   Mr. Chrestman does -- that he does present an identified and

14   articulable threat to an individual or the community going

15   forward.

16           In sum, Munchel, too, just like the few additional

17   facts offered by Mr. Chrestman, does not provide a basis for

18   me to reconsider Chief Judge Howell's detention order.

19           And for all those reasons, I will deny

20   Mr. Chrestman's motion for reconsideration after much

21   thought and review of the record and the law.

22           At that point -- at this point, then -- so thank

23   you all for, again, gathering so quickly to let me deliver

24   that ruling.

25           Mr. Berridge, why don't you remind me what the

1    next time -- what -- the next date we picked out for the

2    other co-defendants.

3              MR. BERRIDGE:  Yes, Your Honor.  Just briefly, I

4    need to pull up my calendar.

5              THE COURT:  I have it down -- I think I have it

6    down as August 6th.  And I --

7              MR. BERRIDGE:  The 6th is --

8              THE COURT:  Mr. Cooper --

9              MR. BERRIDGE:  -- Labor Day.

10             THE COURT:  August 6th.

11             MR. BERRIDGE:  Oh, August 6th.  Right.  That's

12   correct.  Sorry about that.

13             THE COURT:  And, Mr. Cooper, I just can't remember

14   whether we dealt with Speedy Trial Act issues and all the

15   issues and whether we had even set your client for a status

16   on that day before we dismissed all the other defendants and

17   then we dealt with this motion.

18             MR. COOPER:  And I don't think we actually dealt

19   with the -- a specific -- we did -- week again -- I will put

20   on the record that I've discussed with Mr. Chrestman that

21   discovery is -- and --

22             THE COURT:  Mr. --

23             THE COURT REPORTER:  Judge Kelly, I'm having a

24   hard time here.

25             THE COURT:  I know, Tim.

 1          Mr. Cooper, can you stop for one second.  We just

 2   had -- I -- just as I cut in, I heard the court reporter cut

 3   in, too.  We could really not hear you there.  Is there a

 4   way that you -- I've had, on occasion, some folks simply

 5   mute the video connection and call in separately.  So you'd

 6   be able to see us and all, but your voice would be coming

 7   through the phone.  Because we really could not hear you

 8   pretty much at all.  We'll take a -- just a brief --

 9          MR. COOPER:  Let me try that.

10          THE COURT:  You have my indulgence to make that

11   call and to make an audio connection and -- so that we can

12   hear you.

13          (Brief pause.)

14          Ms. Harris, do we have a connection with

15   Mr. Cooper yet?

16          THE DEPUTY CLERK:  Yeah, he just came in the

17   waiting room.  Here he is now.

18          (Brief pause.)

19          (Technological feedback.)

20          MR. BERRIDGE:  Mr. Cooper, if you mute your

21   computer audio, maybe, that might help.

22          MR. COOPER:  I did.  I can still --

23          THE COURT:  I think his computer is muted.

24          MR. COOPER:  It is, but I can still --

25          THE DEPUTY CLERK:  Turn your volume down,

1    Mr. Cooper.  Turn your volume all the way down.

2              MR. COOPER:  It is all the way down.

3              (Brief pause.)

4              It's actually coming from the phone.  Let me do

5    this.  Let me disconnect from the hearing on screen and I'll

6    just do this purely by phone.

7              THE COURT:  All right.

8              (Brief pause.)

9              MR. COOPER:  Okay.  I did that.  How is it --

10             THE COURT:  Much better.

11             MR. COOPER:  -- now?

12             THE COURT:  Much better.

13             MR. COOPER:  All right.

14             THE COURT:  Mr. Cooper, I'm informed that we may

15   have already done this in the prior hearing, but let's just

16   go ahead and do it again just -- you were going to talk

17   about speedy trial.  And, again, I think we already -- I

18   think the record already reflects that we have set you and

19   your client for the status with all the other co-defendants

20   on August 6th, but let's just -- to belt and suspenders it,

21   Mr. Cooper, why don't you make whatever representations

22   you'd like to about the speedy trial.

23             MR. COOPER:  Yes, Your Honor.  I was actually just

24   going to reflect what you said.  I'm not sure that we did

25   actually set the date, but I know we did discuss the speedy

1    trial issue.  And just for the record, I will reiterate that

2    this is something that Mr. Chrestman and I have discussed.

3    He understands that while, on the one hand, he does have,

4    obviously, a right to a speedy trial, on the other hand that

5    speedy trial -- that -- the effectiveness of that trial is

6    dependent upon the discovery being provided and being

7    accumulated by us and being able to prepare for trial.  So

8    with that in mind, we understand that we're in a position

9    where we have to toll the clock at this point in time.

10              THE COURT:  All right.  Very well.

11              I don't think -- if I didn't do it the last time,

12   then for the reasons Mr. Cooper has just laid out and for --

13   and with his consent, I will go ahead and toll Speedy Trial

14   Act for Mr. Chrestman because the ends of justice that are

15   served by taking such action outweigh the best interests of

16   the public and the defendant in a speedy trial from today's

17   date through August 6th.

18              Is there anything further, Mr. Cooper, you would

19   like to raise with me here today?

20              MR. COOPER:  No.  Just the housekeeping matter of

21   what time is that hearing set for on the 6th?

22              MR. BERRIDGE:  It's 10:00 a.m.

23              THE COURT:  I have it set -- correct.  It's set

24   for 10:00 a.m., Mr. Cooper.

25              MR. COOPER:  10:00 a.m.?  Very well.  Thank you.

1    THE COURT:  All right.  Mr. Berridge, anything

2    further from you?

3    MR. BERRIDGE:  No, Your Honor.  Thank you.

4    THE COURT:  All right.  Very well.  With that, the

5    parties are dismissed.

6    MR. COOPER:  Very well.  Thank you, Your Honor.

7    Have a good day.

8    (Proceedings concluded at 10:19 a.m.)

9    * * * * * * * * * * * *

10    **CERTIFICATE OF OFFICIAL COURT REPORTER**

11    **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

12    **that the above and foregoing constitutes a true and accurate**

13    **transcript of my stenographic notes and is a full, true and**

14    **complete transcript of the proceedings to the best of my**

15    **ability, dated this 14th day of July 2021.**

16    **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
**Official Court Reporter**

17    **United States Courthouse**
**Room 6722**

18    **333 Constitution Avenue, NW**
**Washington, DC 20001**

19

20

21

22

23

24

25